[No. D023104. Fourth Dist., Div. One. May 16, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
HARVEY LEE CLARK, Defendant and Appellant.

**COUNSEL**

Greg M. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KREMER, P. J.**—A jury convicted Harvey Lee Clark of possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), possession of methamphetamine while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a)) and being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)). Clark admitted he had suffered a prior prison term within the meaning of Penal Code section 667.5, subdivision (b).

On appeal, Clark contends the court erred in instructing the jury on a "loaded" firearm and the firearm, as a matter of law, was not loaded. Clark also contends the evidence was insufficient to support a finding he possessed or was "armed" with a firearm, and his conviction for possession of methamphetamine must be reversed "because the case was a close one and the court committed numerous errors having a highly prejudicial cumulative effect." We conclude, as a matter of law, the firearm here was not loaded within the meaning of Health and Safety Code section 11370.1, subdivision (a) and accordingly, we reverse the conviction on that count. In all other respects, we affirm.

FACTS

On September 1, 1994, the sheriff's narcotics unit executed a search warrant on a motorhome where Clark and his girlfriend Jina Paradise were living.

Among the items seized were a shotgun, a paper bindle containing meth-amphetamine in a small black pouch for a muscle stimulation device belonging to Clark, a glass pipe used for smoking drugs and a scale. The sheriff's deputies also seized a jewelry box which contained a plastic baggie containing an off-white powdery residue, a glass container containing an off-white powdery substance inside and two straws for inhaling drugs.

Clark told a sheriff's deputy he had been living in the motorhome for three months. He initially denied any knowledge of the shotgun or the drugs but later admitted he knew the shotgun was in the motorhome. He stated it belonged to someone else.

Paradise testified Clark had been living in the motorhome for three months; she had been staying there about three days. She had seen Clark in possession of drugs in the past. He kept his drugs in the black pouch. About three days before the search, she had used drugs with Clark; the drugs had been in a plastic baggie. She believed the methamphetamine found in the motorhome belonged to Clark. She testified the jewelry box belonged to Clark although she kept a few items in there.

Paradise testified she found the shotgun in the motorhome "a long time before" on the upper shelf of a cabinet above the bed. She told Clark about it and he checked into it. Clark surmised it belonged to the owner of the motorhome. The owner of the motorhome would come by quite often and drop off items and leave his clothes there.

Clark testified he had been living in the motorhome only three to four days before the search and that he was "totally surprised" the deputies found drugs inside the motorhome. He testified Paradise smoked methamphetamine and that the jewelry box, glass pipe, the baggies and all the drugs belonged to her. Clark stated Paradise had used methamphetamine the night before the search warrant was executed and was under the influence of drugs at the time the warrant was executed. He testified he did not use drugs, having quit in August 1988. He owned the scale which he used in his business of buying and selling scrap gold.

As to the shotgun, Clark testified when Paradise told him about the weapon, he said he did not want to deal with it and Paradise agreed to talk to the owner to have him remove the weapon. Paradise told him the owner had removed the weapon. Clark checked to make sure the shotgun had been removed and when he did not find it on the shelf in the cabinet, he assumed the owner had removed it.

DISCUSSION

I

*Whether Shotgun was Loaded*

 Clark was convicted of possessing methamphetamine "while armed with a *loaded*, operable firearm" in violation of Health and Safety Code section 11370.1, subdivision (a) (italics added). He contends the court erred in instructing the jury on what the term "loaded" means and argues the shotgun here, as a matter of law, was not loaded. He objected to the court's definition of the term loaded and made a motion for acquittal on the Health and Safety Code section 11370.1, subdivision (a) count because, as a matter of law, the shotgun was not loaded.

The shotgun here is a single-shot shotgun. When the police seized the shotgun, it did not have a shell in the firing chamber. There were, however, three shells located in a covered compartment at the rear of the shotgun's stock. It is not possible to fire a shell from that location; a shell would have to be removed from the compartment and placed by hand in the chamber before it could be fired. A sheriff's deputy testified the shells were located in a "storage area."

Health and Safety Code section 11370.1 does not contain a definition of the term "loaded." The trial court relied on the definition of "loaded" contained in Penal Code section 12031. Penal Code section 12031 punishes the carrying of a loaded firearm in public or in a vehicle. Subdivision (g) of Penal Code section 12031 provides: "A firearm shall be deemed to be loaded for the purposes of this section when there is an unexpended cartridge or shell, consisting of a case which holds a charge of powder and a bullet or shot, in, *or attached in any manner to*, the firearm, including, but not limited to, in the firing chamber, magazine, or clip thereof attached to the firearm; except that a muzzle-loader firearm shall be deemed to be loaded when it is capped or primed and has a powder charge and ball or shot in the barrel or cylinder." (Italics added.)

Using this definition, the court told the jury "A shotgun is deemed to be 'loaded' when there is an unexpended shell . . . in, or attached in any manner to, the shotgun."

The Attorney General argues the court's instruction was correct and the shotgun here was "loaded" within the meaning of Health and Safety Code section 11370.1, subdivision (a) because the shotgun shells, located in a storage compartment in the rear of the stock, were "attached" to the shotgun.

We find this argument unpersuasive. We first observe, that in general, the language of a statute is to be given "its usual, ordinary import." (*Quintano* v. *Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1055 [48 Cal.Rptr.2d 1, 907 P.2d 1057]; *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

The term "loaded" has a commonly understood meaning: "to put a load or charge in (a device or piece of equipment) a gun" or "to put a load on or in a carrier, device, or container; *esp*: to insert the charge or cartridge into the chamber of a firearm." (Webster's New Collegiate Dict. (1976) p. 674.) Under the commonly understood meaning of the term "loaded," a firearm is "loaded" when a shell or cartridge has been placed into a position from which it can be fired; the shotgun is not "loaded" if the shell or cartridge is stored elsewhere and not yet placed in a firing position. The shells here were placed in a separate storage compartment of the shotgun and were not yet "loaded" as the term is commonly understood.

There is nothing in Health and Safety Code section 11370.1 which indicates the Legislature did not intend to use the term "loaded" in its commonly understood meaning. We note Penal Code section 12031 states it is defining the term "loaded" "for the purposes of this section" (Pen. Code, § 12031, subd. (g)); it does not state it is applicable to a Health and Safety Code offense nor does Health and Safety Code section 11370.1 refer to the Penal Code definition.

Second, even if we were to accept the Attorney General's assertion that the definition of "loaded" contained in Penal Code section 12031, subdivision (g) applies to Health and Safety Code section 11370.1, subdivision (a), we would still conclude the shotgun here was not loaded.

A statute "must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. [Citations.]" (*Beaty* v. *Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr. 128].) "The words must be construed in context in light of the nature and obvious purpose of the statute where they appear. [Citation.]" (*Decker* v. *City of Imperial Beach* (1989) 209 Cal.App.3d 349, 354 [257 Cal.Rptr. 356]; *Lakin* v. *Watkins Associated Industries* (1993) 6 Cal.4th 644, 659 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

The Attorney General urges a literal interpretation should be adopted, i.e., that if an unexpended shell is "attached in any manner" to a

firearm, then the firearm is loaded, regardless of whether the shell has been attached in a manner in which it can be fired from the firearm. This literal interpretation, while supported by words contained in the statute, does not appear to comport with the legislative intent.

The Legislature in Penal Code section 12031, subdivision (g), provided some examples of how a shell would be "attached" to a firearm so that the firearm is loaded, i.e., in the firing chamber, magazine or clip; situations in which the firearm would be "loaded" in the usual meaning of the word, i.e., the shell is placed in a position from which it can be fired. Significantly, the Legislature also provided that a muzzle-loader firearm must be capped or primed, have a powder charge and ball in the barrel or cylinder before it is deemed "loaded," again a definition which is consistent with the common meaning of the term "loaded," i.e., ready for firing.

Given the examples are all consistent with an intent to use the common meaning of "loaded," it follows the Legislature's use of the phrase "attached in any manner" to the firearm was intended to encompass a situation where a shell or cartridge might be attached to a firearm or "loaded" for firing by some unconventional method. The phrase does not demonstrate a clear Legislative intent to deem a firearm loaded no matter how a shell is attached to a firearm; in particular, it does not indicate a clear intent to deem a gun "loaded" when the ammunition, as here, is in a storage compartment which is not equivalent to either a magazine or clip and from which the ammunition cannot be fired.

Our conclusion that the Legislature intended "loaded" as used in Penal Code section 12031 to reflect the common definition is supported by the court in *People* v. *Heffner* (1977) 70 Cal.App.3d 643, 650 [139 Cal.Rptr. 45], which reached the same conclusion ("the apparent purpose [of the 'loaded' definition] is to make it clear that for purpose of section 12031 the usual meaning of 'loaded firearm' is to apply."). In *Heffner*, the court noted when the Legislature adopted Penal Code section 12031, it also adopted another Penal Code statute which contained a special definition of "loaded," i.e., that a firearm was loaded if the firearm and unexpended ammunition were in the immediate possession of the same person. This definition applied to the offenses of bringing a "loaded" firearm into certain state governmental offices and residences of certain state officers and legislators. (*People* v. *Heffner, supra,* 70 Cal.App.3d at p. 650; Pen. Code, § 171e.) Since *Heffner*, the Legislature has adopted this special definition of "loaded" for the offense of carrying a loaded firearm with an intent to commit a felony. (Pen. Code,

§§ 12001, subd. (j); 12023.)[1] Significantly, the Legislature has not amended the common definition of "loaded" as used in section 12031 nor elected to provide a specialized definition of "loaded" for Health and Safety Code section 11370.1.

The Attorney General argues we should adopt an expansive definition of "loaded" in light of the Legislature's general concern with increasing punishment for those who possess firearms and our Supreme Court's recognition the presence of firearms and drugs increases the potential for death or injury. (See *People* v. *Bland* (1995) 10 Cal.4th 991, 1001-1002 [43 Cal.Rptr.2d 77, 898 P.2d 391].) While this argument could support a specialized and expansive definition of "loaded" for a violation of Health and Safety Code section 11370.1, subdivision (a), it does not establish such a definition was intended. Had the Legislature intended to apply a specialized definition of "loaded" for Health and Safety Code section 11370.1 encompassing the situation where the ammunition was stored in or adjacent to a firearm, they easily could have so provided. They, however, did not elect to do so.

Finally, we note that at most the Attorney General has raised a potential ambiguity in the use of the term "loaded." ▮ As Clark correctly observes, ambiguities in statutes are to be construed in favor of the defendant; " ' "[t]he defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute. [Citation.]" ' " (*People* v. *Garfield* (1985) 40 Cal.3d 192, 200 [219 Cal.Rptr. 196, 707 P.2d 258].) ▮ Thus, to the extent an ambiguity exists between whether the Legislature intended the term "loaded" to be used in its ordinary sense (i.e., a shell placed in a position ready to be fired) or to be used in an unusual sense (i.e., including a shell placed in a storage compartment from which it cannot be fired), we adopt the construction more favorable to Clark, i.e., that the term was intended to be used in its ordinary sense and that the shotgun here was not loaded.

We conclude the court erred in denying Clark's motion for acquittal on the Health and Safety Code section 11370.1 count. As a matter of law, the shotgun here was not "loaded" within the meaning of Health and Safety Code section 11370.1.[2]

---

[1]The Attorney General contends the definitions of loaded contained in Penal Code sections 171e and 12001, subdivision (j) are applicable. There is no merit to this contention. Those sections, by their terms, clearly only apply to specified offenses (i.e., Pen. Code, §§ 171c, 171d & 12023) and are not generally applicable definitions of the term "loaded."

[2]Since we reverse Clark's Health and Safety Code section 11370.1, subdivision (a) conviction we need not consider whether he was "armed" within the meaning of that statute.

## II

*Sufficiency of Evidence—Possession of a Firearm by a Felon*

■ Clark contends the evidence was insufficient to sustain his conviction of being a felon in possession of a firearm. He argues the People failed to prove he had knowledge he possessed the firearm.

In viewing the sufficiency of the evidence, we view the evidence in the light most favorable to the judgment, drawing all reasonable inferences in its support. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1236 [278 Cal.Rptr. 640, 805 P.2d 899].) We do not reweigh the evidence or reevaluate the credibility of witnesses. (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) Here, there was evidence, favorable to the judgment and sufficient to support it, indicating Clark had knowledge of the shotgun: he admitted to a sheriff's deputy on the day of the search he knew the shotgun was in the motorhome.

## III

*Possession of Methamphetamine*

Clark contends his conviction for possession of methamphetamine must be reversed because the case was close and the trial court committed numerous errors which cumulatively prejudiced his case.

Clark first points to the erroneous instruction on the term "loaded." While this was clearly prejudicial error as to the charge of violating Health and Safety Code section 11370.1, it did not prejudice the jury's consideration of the wholly separate matter of whether Clark possessed methamphetamine. The evidence involving the methamphetamine was distinct and the jury received complete and proper instructions on the issue.

■ Clark next asserts the court erred in refusing to admit results of Paradise's urine test for drugs at the time of her arrest. There was no error. The court sustained two objections to questions Clark's attorney asked to elicit the results of Paradise's urine test. Both objections were properly sustained. Clark first attempted to elicit the information from a sheriff's deputy who neither conducted the test nor knew the test results. The court properly sustained an objection based on hearsay and lack of foundation.

---

We note his argument is based on a premise he was not "armed" because he was not carrying the firearm and after his arrest he did not have access to the firearm were rejected by the Supreme Court in *People* v. *Bland, supra,* 10 Cal.4th 991, 1002-1005.

Clark then attempted to elicit the test results from Paradise herself. Paradise, however, (as the court ruled) was not competent to testify as to the results of the test since she did not conduct the test.

Clark, citing *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], next asserts the sheriff's department's refusal to obtain a urine sample from him deprived him of potentially exculpatory evidence.

Initially, we note Clark does not point to any place in the record where he requested sanctions for the alleged failure of the police to obtain urine samples.

Second, we note the sheriff's department does not have a "duty to *obtain* evidence which may aid a criminal defendant, at least where the evidence is not known by the police to be exculpatory. [Citation.]" (*People* v. *Bothuel* (1988) 205 Cal.App.3d 581, 594 [252 Cal.Rptr. 596], fn. omitted, disapproved on other grounds in *People* v. *Scott* (1994) 9 Cal.4th 331, 347 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; see also *People* v. *Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) The exculpatory value of the evidence here was not apparent at the time.

Third, we note Clark has not established the sheriff's department refused to obtain a urine sample. There is no ruling on this issue and the evidence presented was in conflict. Clark testified he made repeated requests for a urine test, but there was other testimony indicating Clark made no such requests. There was also evidence that after being permitted to use the bathroom in the main house on the property during the search Clark was unable to provide a urine sample and became so combative that the deputies declined to attempt to take a blood sample. Thus, Clark has failed to establish error in this regard, including his assertion the sheriff's department refused to obtain a urine sample.

Clark finally contends the court erred in not sanitizing one of his prior convictions to delete all references to drugs. Clark sought to sanitize a prior felony conviction for possession of drugs for sale if he elected to take the stand and the prosecutor sought to impeach him with it. The court ruled that if Clark testified, the prosecutor would be limited to referring to the conviction as "drug-related" rather than as possession of drugs for sale.

Even if we were to conclude the court abused its discretion in not further sanitizing the prior conviction, we would not reverse. Initially, we note Clark gave a long response to the question of whether he had been convicted of a drug-related felony, detailing the circumstances of his arrest and guilty plea,

asserting the drugs found in the earlier incident did not belong to him, he was innocent and only pleaded guilty because he was advised to do so. Clark thus placed before the jury his position that although previously convicted, the conviction was wrongful.[3]

Moreover, it is highly unlikely the verdict would have been different had the prior conviction been sanitized. There was abundant evidence that methamphetamine was located in the motorhome where Clark was staying. This case involved a simple credibility contest, i.e., whether to believe Paradise or Clark as to who owned the drugs. Clark's credibility was severely impeached by other facts, in particular, his testimony he was "totally surprised" drugs were found in the motorhome and yet he had seen Paradise using drugs the night before and believed she was under the influence at the time the search warrant was executed.

No reversal of Clark's conviction for possession of methamphetamine is merited based on any accumulation of errors.

## DISPOSITION

The conviction for possession of methamphetamine while armed with a loaded, operable firearm in violation of Health and Safety Code section 11370.1 is reversed. In all other respects, the judgment is affirmed.

Work, J., and Benke, J., concurred.

---

[3]We also note Clark's long explanation where he attempted to shift blame (as in this case) was probably more harmful to his case than would have been a simple admission of having been convicted of a drug-related felony many years earlier.